## Case No. 15,227.

UNITED STATES v. The GOOD FRIENDS.

[4 Hall. Law J. 488.]

District Court, D. Delaware. May 5. 1812.

VIOLATION OF NONIMPORTATION LAWS—LIBEL OF FORFEITURE—ACQUISITION OF SPANISH TERRITORY BY UNITED STATES—UNAUTHORIZED ACTS OF PUBLIC AGENT.

[1. Where an American vessel was laden in England in 1811 with a cargo of dry goods of British manufacture. and cleared thence for Amelia Island, Rio Janeiro, and Philadelphia, and proceeded to Amelia Island. and lay there for about two months. without breaking bulk, after which she sailed direct to Philadelphia. held that, in view of these movements, and of certain letters found on board from the owner to the supercargo, which indicated an expectation that the cargo would be brought to Philadelphia. the same must be found to have been "put on board" the ship with the intent to import the same into the United States. within the meaning of the 6th section of the nonimportation act of March 1. 1809 (2 Stat. 528). and was consequently subject to forfeiture thereunder.]

[2. The nonimportation act of March 1. 1809. must be construed to prohibit the introduction into the United States of every article of British merchandise or manufacture for any use whatever. without any exception which would permit a shipowner to import any articles (such, for instance. as anchors. sheathing copper, charts, etc.) intended for his own use.]

[3. Act Cong. Jan. 15, 1811 (3 Stat. 471), authorizing the president to take possession of all or any part of the Spanish territory lying east of the river Perdido and south of the state of Georgia. etc.. "in case an arrangement has been or shall be made with the local authority of said territory for delivering up the possession of the same. or any part thereof. to the United States, or in the event of an attempt to occupy the said territory. or any part thereof. by a foreign government." gave authority to acquire the territory only in a friendly manner. and by compact or negotiation without hostility, or the exhibition of military force, except in case of an attempt by a foreign force to occupy the same; and hence, in the absence of any such attempt, the action of the American agent in accepting a cession of Amelia Island from a party of armed people calling themselves "Patriots," who, by an exhibition of force, had, a short time before, compelled the Spanish authorities to capitulate to them. was without authority of law.]

[4. The term "local authority," as used in the foregoing act of congress. meant such authority as had the immediate government or superintendence of the territory to be surrendered. namely, the Spanish colonial authority. and no other.]

[5. The act of the agent of the United States. after thus acquiring possession of Amelia Island. in granting to American vessels then lying there clearances to ports of the United States upon giving bond for payment of duties on their cargoes, was wholly void in respect to a vessel laden with goods of British manufacture. and could not in any way operate to prevent a forfeiture thereof under the nonimportation act of March 1, 1809.]

[6. A bond given with a condition that obliges a person to bring goods of British manufacture into a port of the United States in violation of the nonimportation laws is void.]

[This was a libel of forfeiture filed against the ship Good Friends and cargo, charging a violation of the nonimportation act of March 1. 1809.]

FISHER. District Judge. The ship Good Friends. Robert Thompson. master. owned and claimed by Stephen Girard, merchant, of Philadelphia. registered on the 9th of March. 1804. laden with flour and carrying a sea letter dated 27th of July. 1811. sailed from the Capes of Delaware on the first of August. 1811. was bound for the port of Lisbon. in the kingdom of Portugal. and a market. She arrived on the 30th of August at Lisbon. and discharged and sold her flour agreeably to instructions. She left Lisbon after the sale of her outward cargo about the last of September. The supercargo landed in England on the 10th of October. Ten days afterwards the Good Friends arrived at London. At the time of the vessel's arrival at London. Mr. Charles Banker. on account of the claimant (who had already sailed for and had arrived in England). had purchased about 10,000 pounds sterling worth of her inward cargo. The purchases of the inward cargo were made from funds of the claimant already in England, in the hands of Baring Brothers & Co. These purchases closed about the middle of December in the same year. The ship left England on the 4th of January. 1812. laden with dry goods of best quality of British manufacture. Her clearance, dated 14th December. 1811. from the custom-house of London. is for Amelia Island. a Spanish port. Rio Janeiro. in the Brazils. a Portuguese port. and Philadelphia. On the 9th or 10th of February, 1812. the ship arrived at Amelia Island, after a direct voyage from London to that place. She lay there, without breaking bulk, until the 10th of April. when she sailed for the port of Philadelphia; and on the 12th of the same month, arriving in the waters of the Delaware. she was seized by an officer of the revenue for this district: for the violation of a law of the United States passed on the first of March. 1809, commonly called the "Nonimportation Act." The Good Friends. for this offence. was libelled by the proper officer on the part of the United States in this district, on the 5th day of May last, as forfeited. This cause was heard at great length . at the November term last of this court. sitting at Newcastle.

The fourth section of the act of congress above mentioned prohibits the importation into the United States or the territories thereof, after the 20th of May following, of any goods, wares, and merchandizes whatsoever from any port situated in Great Britain or Ireland, or any of the colonies or dependencies of Great Britain. or from any port or place in her actual possession. The same prohibi-

tion is by the same law enacted against France, but has been since dispensed with. All goods, wares. and merchandize being of the growth. product. or manufacture of Great Britain or Ireland. or of the colonies or dependencies of Great Britain, are by the same section prohibited from being imported from any port or place whatever; certain clearances for ports beyond the Cape of Good Hope, &c., only excepted. By the fifth section. the prohibited articles are, if imported into the United States or their territories, forfeited. The sixth section is the only one by which it is alleged the forfeiture accrues, in the present case, of the ship Good Friends to the United States The words are: "That if any article or articles the importation of which is prohibited by this act, shall after the twentieth of May be put on board of any ship or vessel, boat. raft or carriage, with intention to import the same into the United States or the territories thereof, contrary to the true intent and meaning of this act. and with the knowledge of the owner or master of such ship or vessel. boat. raft or carriage such ship or vessel. boat, raft or carriage shall be forfeited, and the owner and master thereof shall moreover each forfeit and pay treble the value of such articles."

It has been truly alleged in the argument. by one of the advocates of the claimants. that the fact of importation is. independent of the act of congress. no offence. It has, however. been made an offence by the legislative authority of the country, and it cannot be dissembled that the ship Good Friends has done the very act prohibited by the fourth section of the act aforesaid. and that she is forfeited, unless there exist such facts and circumstances in her case as will exempt her from the operation of the act. The duty prescribed to this court now is to determine whether this ship has had put on board of her British manufactures. and brought them into the United States. under such circumstances as will protect her from forfeiture. It has been contended by the advocates for the claimants, that there is no evidence in the present case of any intention on the part of the claimant or his agents to put on board the goods to import the same into the United States or the territories thereof, and that it is incumbent on the part of the United States to prove such intention.

It is in evidence in this cause that the claimant had vast funds on the continent of Europe. being the proceeds of several cargoes exported and sold there; that he had endeavored. and very successfully. too. to concentrate these funds in the hands of Baring Brothers & Co.. a house in London: that, viewing the uncertain state of the relations between this country and Great Britain, he was very uneasy. lest he might fail in accomplishing the great purpose he held in view. His desire to be in possession of his funds. at such a juncture. was very laudable; especially as it would redound to his own se-

curity, as well as be adding to the resources of his country. The simple question on this part of the case is whether the claimant intended a commercial profit on the back of the funds which he thus wished to be in his own possession, by lading the Good Friends with British manufactures for the American market. The letter of instructions to the supercargo, Mr. Adgate, is dated at Philadelphia. on the 27th of July. 1811. four days anterior to the ship's putting to sea. In this letter it is remarkable that nothing is said in respect to the ulterior destination of the bulk of the inward cargo which was to be taken on board at London. From this letter it would seem as if a part. at any rate. of the inward cargo was intended to be imported into Philadelphia. This is to be inferred from sundry expressions contained in it. such as the following: "As it respects letters, I have no objection to take in my ships those from American supercargoes. masters. officers, and crew to their families or owners or their vessels." Speaking of the purchase of anchors for his new ship. I suppose on the stocks of this country, the claimant says. "And if they cannot be obtained in Portugal or Spain, you are to purchase them in England. &c." Again. "No matter if the anchors are forged in England. so they are well made, of good iron bars, &c." And. further, "Should I want any other articles from England, I will write you in time, care of Messrs. Baring Brothers and Co.. at London." There is. however. a clause in this letter of instructions, which strongly intended that the whole of the inward cargo was expected to be brought into Philadelphia. Speaking of the terms on which he engaged Mr. Adgate. he says: "3d. Five hundred dollars additional will be paid to you if the ship Good Friends proceeds from a port in Portugal or Spain to London. and there takes in a cargo on my account, as before mentioned. and arrives safe in this port." What port is meant to be arrived at? Why certainly, the one at which the letter is dated. Where is she to take in her cargo? Plainly and undoubtedly, at London. He further is desirous of purchasing on his own account a complete set of separate maps of that part of this continent from the south boundaries of the United States, including Mexico. all the way round Cape Horn, as far as it is navigable. &c. From these clauses of the letter of the 27th July it would seem as if the inward cargo. or at any rate a part of it. was destined at that time for the port. of Philadelphia. the residence of the claimant.

It is now to be considered how far the effect of the above letter is done away by those which follow. of the 14th of October and the 29th of December, 1811. The letter of the 14th of October, was received by the supercargo on the 5th of December ensuing. at London. nine days only before the completion of lading and the date of the clearance. From the evidence of Mr. Adgate it seems that the purchases of the inward cargo closed about

the middle of December. Must not. therefore, an inference arise, that before receiving the letter of the 14th of October a considerable part of the cargo was shipped under the letter of the 27th of July? But the letter of the 14th of October most clearly and unequivocally proves to my mind the destination to both Amelia Island and Rio Janeiro to be colourable, and not real. It is the first paper in this cause. in point of date, which mentions Amelia Island as the place of destination, and orders the ship to proceed "near enough to our capes to put letters on board to point out the destination" of the claimants. It appears, then, that his intention was thereafter "to be pointed out." although he in the same letter orders the clearance for Amelia Island. Could Amelia Island or Rio Janeiro be the place at which he wished his cargo to be unladen and sold? If either of them were, why speak in the letter of pointing out his intention, the continuance of the nonimportation acts. and of the orders in council? Neither of these governmental acts could affect the ship or cargo at either Amelia Island or the Brazils. Why wish her to come so near the Capes of Delaware, if her destination was bona fide for either the Spanish or Portuguese ports? The letter of the 29th of December is an after-act, and cannot have much weight in the decision of the present case. It was not received until after the arrival of the ship at Amelia Island, or until the day after. It was written in Philadelphia. after the shipment of the cargo at London, and but a short time before the ship left the British waters. Even this document proves only in his favour that the claimant did not wish to bring his ship into Philadelphia. and subject her and her cargo to forfeiture directly in the face of the nonimportation act. It is ascertained by this letter that she was not to unlade or break bulk at Amelia Island, but was to be kept in such manner as at any time to proceed with her cargo to such port as the claimant should point out. By the way. all this time there is no mention made of the voyage to Rio Janeiro: but there is to be gathered an evident avidity in the claimant, apparent on the face of this letter, on the first intimation that the restrictive act is repealed that the ship should come direct for the port of Philadelphia; and this, too, without advice from himself of such being the fact. It follows that this court is of opinion that the evidence of the intention of lading in London to import into the United States is manifest from the documentary evidence to which we have alluded; and we are further of opinion that this evidence is strongly corroborated, nay. concluded. by the London clearance. This document is the voluntary act of the captain. and presents, together with the act of since bringing them in, indisputable evidence of the goods being put on board with a view to the American market. In this paper Amelia Island. Rio Janeiro, and Philadelphia are named, and most probably named with a full intention and understanding among the parties of being filled up in the handwriting of the customhouse officers at London,—not in print, but in manuscript. To this paper it has been replied by the claimant's advocates that the ship might not have arrived with her cargo until the repeal of the restrictive acts, and: for that event, and with that view, was the clearance filled up with the word "Philadelphia." I would ask if this be the course of transactions of this kind, and if there is any evidence in the cause to support such a supposition? Is the lying at Amelia Island upward of two months, waiting the result of the memorial to congress, presented by the claimant and others, in favour of special importations, evidence of such a position? There is, however, still further evidence of a part of the cargo being put on board in London with an intention to bring it into a prohibited port. I mean the memorial presented by the claimant to congress dated on the 9th of March. 1812. By this paper it appears that property in British manufactures amounting to 1,863. pounds 18s. sterling was shipped on board. the Good Friends for the express purpose of being brought to and used in the port of Philadelphia, consisting of "three anchors, a quantity of sheathing copper, copper nails, a small bale of bunting, four night glasses, and. several charts,"—thereby fulfilling, in respect of these articles, the wishes of the claimant expressed in his letter of the 27th of July. These articles, by the explanatory statement annexed to the memorial. are excepted from the general wish which the claimant had of being permitted by congress to order the ship round to Philadelphia as a place of safety. and of there entering her cargo for exportation. The captain. he says, has given bonds in England to land the copper and anchors in a port of the United States. From this document. then. as well as the letter last mentioned, it appears that these articles were intended for the use of the claimant himself: but it has been very ingeniously replied that if these anchors and the other articles composing this part of the shipment were intended for the use of the claimant. and not as articles of merchandize, their importation cannot influence a decision of the present case against him, if even put on board with intention of being brought here. In support of this principle a case has been cited from 3 Dall. 297, as being fully in point. This case has been attentively considered, and this court is of opinion that it does not go the length contended for by the claimant's advocates. It is true that an act of congress passed on the 22d of May, 1794 [1 Stat. 369], prohibiting for one year ensuing the exportation of arms and. ammunition.

The La Vengeance was alleged to have exported these articles from the United States. against the form of the act, but it appeared that the powder constituted a part of the equipment of the French frigate the Semillante. and did never belong to the United

States, nor was it of their manufacture; and that the muskets mentioned in the information were the private property of French passengers on board La Vengeance, "carried out for their own use, and not by way of merchandize." It must be evident that the nonimportation act was made to prohibit the introduction into the United States of British merchandize for any use whatever, and thereby to strike at the interests of a nation whose government was heaping upon us vexations and injustice without number and without end. We are of opinion that congress intended to prohibit importations of every article with a view to the consumption of the country, otherwise the nonimportation system would be a laborious nullity and a dead letter: and surely, if congress had intended to let in British manufactures for any purpose or use whatever, the law would have contained an exception. We, however, find none; and as a matter of construction we can never sanction such a one of any law as would inevitably defeat the ends for which it was enacted. Such a construction is indubitably the wrong one. The whole mercantile class of the community might, under such a construction, enter into importations with the avowed object of being for their own use; and by such means the United States in the face of the legislative prohibition might become inundated with British manufactures. This court cannot adopt such a construction, as would, if sanctioned by the judiciary of the country, violate the plain intention of the act, and frustrate all the benefits intended from it. The act of May, 1794, was passed to prevent the United States being drained of those materials, by their exportation abroad, without which the country could not be defended; and the construction was perhaps a reasonable one, that twenty muskets, bought by individuals for personal defence, and not with views of mercantile profit or for other foreign markets, could not be considered a violation of the law. Very different, in the opinion of this court, is the importation of upwards of 1,500 pounds sterling worth of British manufactures, when our prohibitory act without exception forbids the introduction altogether of British merchandise, in terms the most broad and unequivocal.

Independently of the documentary, there is abundant other testimony in this cause of the cargo "being put on board" the Good Friends for importation into the United States. The claimant certainly never could intend to lay out nearly 67,000 pounds sterling in any goods for the purpose of being carried to an uncertain or a glutted market. His funds in England were in able, responsible hands, and his goods were purchased with monies taken up from Messrs. Baring Brothers & Co. in pursuance of his own orders. Importation to Amelia Island of British dry goods, to so great an amount, is inconsistent with the mercantile eminence and known acuteness of the claimant. He would have preferred bringing his money home in bills, or in any other manner, to bringing a cargo of such an amount to such a market. His supercargo swears that the whole of the inhabitants of Fernandina of all ages, sexes and colours, do not amount to 300, and that the land of Amelia Island is very poor and thinly populated. The whole of the wealth of this island was not sufficient for the purchase of this cargo. Besides, from the good understanding which has existed between the British and Spanish governments for some years past, it is reasonable to conclude that British manufactures were to be obtained in great abundance anterior to the arrival thither of the Good Friends. The British are sufficiently eager to supply, indeed to glut, every market open to their manufactures. The Good Friends arrived there on the 19th of February, and lay in the Spanish waters until the 10th of April, without breaking bulk, or exposing any part of the cargo to sale. Nor have we any testimony of its being consigned to any person to superintend its sale, and to account for and remit its proceeds. So far from any of these measures being taken, we have it from under the hand of the claimant that the vessel was "to be kept in such manner as at any time to proceed with her cargo to such port as he should point out." The conclusion from these facts is, that Amelia Island could not have been the real port of destination. But Rio Janeiro is another port of destination. It is, I believe, not mentioned in the claimant's letter of the 14th of October, nor in the original manifest, or the consular certificate, and must have been inserted on the suggestion of the master of the ship, or of some agent of the claimant. The manifest and consular certificate mention Amelia Island, &c. The clearance itself mentions Rio Janeiro. There does not appear to have been any obstacle to the ship's proceeding to that market, had such been her intention. That, perhaps, was not an empty market. The British trade there themselves, and it was but reasonable to conclude that an ample supply of their manufactures was on hand. No attempt was made to enjoy the Brazilian market, though an ample opportunity was afforded during the delay at Amelia Island. Indeed, according to my recollection, the claimant nowhere mentions this port as the one which in any event is to be the receptacle of his cargo. One of his advocates has urged as an excuse for not going to Rio Janeiro that the property would there have been seized as an indemnity for the seizure of Florida. It is hardly to be supposed that the Portuguese would proceed to such a length for any injury committed against the Spanish government. I am compelled to decide from these facts, united with the paper testimony heretofore considered, that the cargo of the Good Friends was put on board at London, not with a real destination for Amelia Island or Rio Janeiro, but for

the port of Philadelphia in the United States. The last place presented every invitation which mercantile cupidity could hope for, because of the interrupted state of commerce which for some years had existed.

I might here close, and order the decree which would result from the foregoing convictions, but that several other questions of great magnitude have arisen and been discussed in this cause, which it may be thought incumbent on me to decide.

It is urged on the part of the claimant in this case that the ship is protected from forfeiture by the conduct of the government of the United States and their agents in receiving the cession of Amelia Island, and by the conduct of those agents subsequent to the cession. By a secret act of congress, passed on the 15th January, 1811, the president of the United States was authorized "to take possession of all or any part of the territory lying east of the river Perdido, and south of the state of Georgia and the Mississippi territory, in case an arrangement has been, or shall be, made with the local authority of the said territory for delivering up the possession of the same, or any part thereof, to the United States, or in the event of an attempt to occupy the said territory, or any part thereof by any foreign government." On the 26th of January, same year, General George Matthews and Colonel John M'Kee, were appointed by the president joint and several commissioners for carrying into effect the provisions of the foregoing act. It appears from the testimony that on the 16th of March last, the town of Fernandina, in Amelia Island, was summoned to surrender by a number of armed people, calling themselves "Patriots"; that on the 17th it capitulated, by striking the Spanish flag to that of the patriots; that on the 11th it was ceded by the patriots to General Matthews, as United States commissioner, who hoisted the flag of the United States in place of that of the patriots; that General Matthews took possession, at the head of fifty armed men, being a detachment of United States' troops. There were lying in the adjacent waters from five to eight United States gunboats, under the command of Commodore Campbell; that at the time of the cession these gunboats lay opposite the town, side to, with springs on their cables; that after the cession General Matthews appointed a judge, a collector, a harbour master, and a notary publick. On the 2d of April following, the ship Good Friends, theretofore lying in the waters of Amelia river, was cleared out for the port of Philadelphia from Fernandina, by the collector there, whom General Matthews had appointed, after giving bond for securing the duties on the ship and cargo. The clearance was accompanied by a letter from General Matthews to John Steele, Esquire, collector of the port of Philadelphia, stating the capitulation, surrender, cession, &c. of Fernandina and Amelia Island. On the 4th of April the government of the United States disavowed the conduct of General Matthews, revoked his powers, and committed them to another person.

These facts have given rise to several very important questions which were debated at the bar with great science and ability by the advocates of counsel for both sides. The first question raised is whether Matthews did or did not exceed the powers delegated to him by receiving the cession of Amelia Island in the manner he did receive it. The words of the act of congress from whence the whole authority to occupy East Florida originated are: "In case an arrangement has been or shall be made with the local authority of the said territory for delivering up the possession of the same or any part thereof to the United States." These words define the first casus in which the commissioners were to act, and to occupy the territory for the United States. The language of the letter of instructions to the commissioners is: "Should you find Governor Folk, or the local authority existing there, inclined to surrender in 'an amicable manner' the possession of the remaining portion or portions of West Florida now held by him in the name of the Spanish monarchy, you are to accept in behalf of the United States the abdication of his or of the other existing authority, and the jurisdiction of the country over which it extends. And, should a stipulation be insisted on for the redelivery of the country at a future period, you may engage for such redelivery to the lawful sovereign." In the fifth paragraph of the letter are the following words: "These directions are adapted to one of the contingencies specified in the act of congress, namely, 'the amicable surrender of the territory by the local ruling authority.' ". From the plain meaning of all this language it would seem as if Matthews, in relation to the first contingency, was to act as a peaceful negotiator and in an amicable manner. In support of this idea the act speaks of an "arrangement" which has been or is to be made in relation to the surrender of the territory. The word "arrangement" here means something depending on and preparatory to a compact, and a compact, too, to be made in a friendly manner; that is, without any pre-existing hostility. The word "arrangement" and those which follow it must mean something voluntary on the part of the authorities ceding the territory, for no compulsion could be contemplated, as no force in this case was to be resorted to. We must therefore infer that the clear meaning of this casus was a voluntary or amicable surrender of the territory without the aid of force or the show of military authority. This idea is abundantly supported by the letter of instructions under which General Matthews acted. This paper was penned by the secretary of state, about ten days after the act passed, and, though there is a slight variance from the language, yet it follows the meaning of the act.

The letter uses these words: "inclined to surrender in an amicable manner the possession. &c." The obvious meaning of this language is, that the territory was to be acquired in a friendly manner, and by compact or negotiation without hostility or the exhibition of a military force.

2dly, as to the authority which was to make the surrender. With regard to colonies there are generally authorities of two kinds—the authority of the mother country by which the colony has been discovered, planted and settled. or acquired by conquest or treaty, and which retains and exercises many of the more important attributes of sovereignty; and the "local authority" of the colony, which is exercised for its immediate government, and in the colony itself. The latter is called from usage and propriety of language the "local authority," by way of contradistinguishing it from the former. The meaning of the words "local authority," as used in the act of congress. I am of opinion must be such authority alone as had the immediate, or. if you please, the "local," government or superintendence of the territory about to be surrendered. namely. the colonial authority, and no other. In this sense congress must have used the term. The authority of the mother country could not, in the nature of things, and never was intended to, be applied to for the cession. Governor Folk's name being mentioned in the instructions was a sufficient guide to Matthews as to the authority intended by the act and by the executive who issued instructions under it. The act uses the words "local authority"; the instructions vary in a small degree from these words; and probably, to meet the possible case of Folk's removal from office, uses the words in one place "local authority existing there," and in another "the local ruling authority." In both cases the instructions correspond with the true intent and meaning of the act. They both meant the local provincial or colonial authority. Did that authority make the surrender to Matthews? Was it made by Governor Folk, or even Don Lopez? Or was it made by the existing provincial or colonial authority? Was it made by that authority which existed when the law passed, or which had held the territory of the crown of Spain? Certainly by none of them. but by such an authority as had stepped in between the one congress had contemplated and General Matthews. Nor does the cession bear that voluntary and peaceful character which was desired and described by the legislative and executive department of our government. But in this case there is a summons by the patriot forces of the town of Fernandina, on the 16th of March to surrender on the next day. It capitulates and surrenders; both of which are measures of war, and the consequences of hostile movements.

Under this view of the subject, I am clearly of opinion that the first casus or contingency mentioned in the law did not arise; and that Governor Matthews in receiving the cession as he did, exceeded. and of course violated, both the letter and spirit of his powers: that he obtained the territory by usurpation, and not by compact, unless the second casus arose, in which force was to be used. and this brings us to examine whether the second casus did arise, in which possession was to be taken by force. On this part of the subject I shall attempt brevity, as not much contest has arisen at the bar upon it. It is not pretended that the force to which Fernandina capitulated was a foreign one; that force, therefore. is laid out of the case. Matthews, in regard to the second contingency, was to keep on the alert. "on suspicion of a foreign force being about to occupy the territory"; and he was to preoccupy it by force, only on the first undoubted manifestation of the approach of a force for that purpose. It is not in proof that such a force did approach for such a purpose. It follows that the possession which was obtained was unauthorized and illegal. The agent acted beyond the limits of his authority, and what he did of course was void.

But a second question on this part of the case is whether the bonding at and clearance from Amelia Island to Philadelphia was a forced or a voluntary act on the part of the agents of the claimant. Mr. Adgate, the supercargo, states that after the cession he felt very uneasy for the safety of the property, and waited on General Matthews, to know how he was to consider himself and the property. under his charge. Matthews told him he might consider himself in the United States. The supercargo considered the property in imminent danger. Matthews agreed with him. He told the supercargo finally, he would give a clearance from the custom-house of Fernandina, on securing the duties. Matthews required a bond for this purpose in the sum of forty-six thousand and odd dollars, that the vessel and cargo should be delivered in charge to the collector of Philadelphia. until, as Matthews' letter expressed it, "the determination of the government of the United States be known, as relates to her case." Neither the testimony of the supercargo nor the letter of Matthews enforces conviction that there was any force used to give the bond or accept the clearance. The supercargo indeed implies, and very strongly, that he made the first overture to Matthews, in consequence of his own uneasiness in respect to the property. Matthews views the clearance in two lights: as a measure of justice. for which he gives no reasons; and as one of policy, lest the vessel and cargo "might invite the attack of piratical marauders." He seems a little suspicious lest she might bring trouble on his hands. George Turner deposes that the vessels were not compelled by the government of Amelia Island to depart. but were required to give bonds before they were allowed to

depart; that the bonds required that they should proceed to their destined ports in the United States, and that the power de facto did not take possession of the ships and vessels in the harbour further than the general possession given them by the cession of the island. The only testimony that supports the idea of any compulsion to secure duties is that of James Girdon. He says "that all American vessels were compelled to secure the duties on their cargoes for the use and benefit of the United States at Amelia Island, by giving bond to the collector there." This, however, shows what he means by the word "compelled." We shall, however, presently see whether such bonds are compulsory. It further appears that the captains and supercargoes of several ships, and among them of the Good Friends, preferred a petition to Matthews. after the cession. on the subject of the ships and cargoes; that Matthews, in his answer, wished them to vary the form of the application. The first petition to him does not appear in the proceedings, but that pursuant to the form he advises does, and bears a contemporary date with his reply to the first petition. So it would seem that, so far from any compulsion being used, the arrival into the waters of the United States was, on the part of the agents of the claimant, voluntary and solicited. By the way, they state that they had been waiting at Amelia Island until they could be legally admitted to come hither. and state, in the same paper. Philadelphia as their port of destination. We do not discover any .exercise of the vis major in this case. Had such been the fact, our opinion might and probably would have been different; for the coming into the waters of the United States would have been imputable to the compelling force, and not to the claimant or to his agents. But so far from the vis major, we find no exclusive possession taken of the ships which had been riding in the Spanish waters by the military occupants of the island or by the gunboats which were in its waters. The ships are as unmolested as before the surrender. The whole uneasiness in the case is with Mr. Adgate. He it is that applies to Matthews to know what to do. Matthews, fearing the Colibri, I suppose, which had been seen some time before in the offing, but which had gone further to the south, takes his bond, and clears him out for a port in the United States. There certainly then was no external force. or even the offer of it.

The next question which offers for our consideration is, can the bond be deemed compulsion in the case? The bond, we are told, was given with condition to come to the port of Philadelphia, and with a cargo of dry goods of British manufacture. We have before seen that such articles are forbidden to be brought here, and by the law of the land. It is clearly unlawful to bring in such a cargo. We are informed by our law that a

bond given with a condition which obliges a person to do an act or to the performance of a thing which is unlawful, is void. 3 Bac. Abr. 703; Co. Litt. 206b; Cro. Eliz. 705. The inevitable conclusion is, the bringing in goods of British manufacture being unlawful, a bond with a condition to do that thing is void and of no effect. Such an instrument could never form the ground of a recovery in any court of justice in the United States. It could have no compulsory effect belonging to it, and in this view of the subject there was no compulsion to bring in the cargo, even according to the deposition of Girdon.

These are all the questions which I have thought it material to consider in this cause. I will now beg leave to remark that in a republican government like ours. which exists only by the force and obligation of its laws, it is of primary importance that those laws should be obeyed; that they should operate equally; that the obedience yielded to them may be cheerful and willing; that if one member of the community shall be exempted from their operation, every other is injured, and has a right to complain; and that in proportion as the laws become disregarded and ineffectual the government from which they emanate becomes enfeebled, and eventually is incapable of providing for its own security and the happiness of the people. It therefore certainly behooves every functionary of such a government, by whom the laws are to be expounded, to be cautious how he admits facts on principles virtually· to do away the force and effect of a law. By admissions of this kind a judicial magistrate may usurp all the powers which belong to a free government. He may virtually, though he cannot formally, repeal a law. He may excuse. though he cannot pardon, an offence against the law; forgetting the wise maxim of the common law, "Sed est tutissima cassis sub clypeo legis nemo decipitur." On the other hand. it must be confessed that there are cases of violation of the laws where the offender ought not to suffer their penalties; but the great question in cases of this kind. in a well-regulated government. is whether he ought not rather to look up for . indemnity to the executive authority than to the judicial magistrate. The one can listen to the suggestions of clemency in a hard case. while the other is the lex loquens,— the law speaking,—or the medium through which its penalties are pronounced against its violators. I do not mean by what I have said that a judge should be unmerciful; but merely that he confine himself to those functions which his government have conferred upon him.

I may do wrong to the claimant by the decision which I now make, but the wrong is unintentional on my part. If, however, I have erred, the error will hereafter be corrected by the great and learned appellate authorities before whom this cause will go when it shall have left this court; and a great

consolation to me is that in cases of magnitude the final decision is not here. Were my judgment of this case to be formed according to my prepossessions which I have received of the claimants, very different indeed would it be from what it is. But I am bound by a tie which admits no personal partialities or animosities to mingle themselves in my decision. They can never form the grounds of my decrees. Let a decree of forfeiture be entered.